UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

EXCHANGE LISTING, LLC,

                    Plaintiff,

          -v.-                                    22 Civ. 1889 (KPF)

INSPIRA TECHNOLOGIES, LTD. *a/k/a*              **OPINION AND ORDER**
INSPIRA TECHNOLOGIES OXY B.H.N. LTD.
and JOE HAYON,

                    Defendants.

KATHERINE POLK FAILLA, District Judge:

        Achieving an initial public offering of securities for a private company is

often a cause for celebration.  Not getting paid for the work undertaken to

accomplish the offering, by contrast, is often a cause for litigation.  Exchange

Listing, LLC ("Plaintiff") alleges that it entered into a written contract with

Inspira Technologies, Ltd. ("Inspira"), whereby Plaintiff was to provide a variety

of advisory services to Inspira to help accomplish Inspira's initial public

offering.  Plaintiff alleges that Inspira breached this agreement and deprived

Plaintiff of the benefit of its bargain, and then breached a subsequent oral

agreement pertaining to the same offering.  Inspira and one of its officers, Joe

Hayon ("Hayon," and together with Inspira, "Defendants"), now move to dismiss

Plaintiff's Complaint.  For the reasons that follow, the Court grants in part and

denies in part Defendants' motion.

**BACKGROUND**[1]

A.    **Factual Background**

1.    **The Capital Market Advisory Agreement**

Plaintiff is a limited liability company with two members — one, a citizen of Florida, and the other, a citizen of New Jersey. (Compl. ¶ 9). Plaintiff provides a variety of advisory services to "pre-IPO emerging growth companies"[2] seeking to be listed on prominent stock exchanges, like the New York Stock Exchange. (*Id.* ¶ 14). Inspira is an Israeli corporation presently listed on the Nasdaq Capital Markets exchange (the "NASDAQ"). (*Id.* ¶ 10). Hayon is Inspira's Chief Financial Officer, President, Director, and Co-founder. (*Id.* ¶ 11).

Defendants sought Plaintiff's services in connection with their desire to complete an IPO for Inspira and to have the company listed on a national exchange. (Compl. ¶¶ 15-16). The parties' discussions on this point culminated in the written Capital Market Advisory Agreement (the "CMAA"), which the parties entered into on September 30, 2020, and through which

---

[1]    This Opinion draws its facts primarily from the Complaint (Dkt. #1 ("Compl.")), the well-pleaded allegations of which are taken as true for purposes of this Opinion. The Court sources additional facts from the exhibits attached to the Complaint, including the Capital Market Advisory Agreement (Dkt. 1-1 (the "CMAA")).

   For ease of reference, the Court refers to Defendants' memorandum of law in support of their motion to dismiss as "Def. Br." (Dkt. #16); to Plaintiff's memorandum of law in opposition as "Pl. Opp." (Dkt. #17); and to Defendants' reply memorandum of law as "Def. Reply" (Dkt. #18).

[2]    "IPO" stands for initial public offering, and is the process through which a private company becomes public by offering shares to the investing public in a stock issuance for the first time.

Plaintiff was to provide advisory services to Inspira with an eye toward Inspira's IPO.  (*Id.* ¶ 17).

The CMAA includes a detailed "scope of work."  (Compl. ¶ 19; CMAA § 1.C.).  As relevant here, Plaintiff was to introduce Inspira to investment bankers who could underwrite the IPO (the "Introduced Bankers"); introduce Inspira to other service providers, including legal counsel, to assist with the IPO; and assist Inspira with other pre-IPO tasks, including preparing Inspira's registration statement and managing the NASDAQ listing application process. (Compl. ¶ 19; CMAA § 1.C.).  The term of the CMAA began with its execution, and was to run for a period of no less than six months or until Inspira was trading on the NASDAQ, unless the CMAA was terminated in accordance with its terms.  (Compl. ¶ 18; CMAA § 2).

The CMAA provided two methods for termination.  *First*, Inspira could terminate by providing written notice within thirty days of its deadline to complete "Safe Financing."  (CMAA § 9).  "Safe Financing" refers to the event of Inspira closing at least $1,500,000 in financing, which was to be completed within forty-five days of the CMAA's execution.  (*Id.* § 4 & Schedule A).  Thus, together with the thirty-day period for providing written notice, Inspira could terminate the CMAA within seventy-five days of its execution.  *Second*, Inspira could terminate the CMAA for cause based on Plaintiff's material breach, Plaintiff's gross negligence or willful misconduct, or any "material acts" that could inhibit Plaintiff from performing under the CMAA.  (*Id.* § 9).

The CMAA also defines what compensation would be due to Plaintiff under various scenarios.  For instance, upon execution of the CMAA, Inspira was to issue 150,000 warrants to Plaintiff exercisable at a price per share either set forth in the Safe Financing, or, in the event that Inspira did not complete Safe Financing, at a price of $4 per share.  (CMAA § 4).  Inspira was to include the "share underlying the [w]arrants" in its registration statement with the SEC.  (*Id.*).  The CMAA also spells out additional compensation Plaintiff could earn contingent on the occurrence of certain events.  If Inspira were to complete the Safe Financing or if Inspira were to retain any of the Introduced Bankers and complete the IPO within twelve months, Inspira would owe Plaintiff: (i) $5,000 per month beginning with retention of an Introduced Banker, with payments commencing upon completion of the Safe Financing; (ii) a $25,000 bonus upon completion of the Safe Financing; (iii) $50,000 upon completion of the IPO; (iv) shares of Inspira's common stock in line with a fee schedule included in the CMAA upon completion of the IPO; and (v) reimbursement for certain costs and expenses.  (*Id.*).

Finally, the CMAA includes certain additional terms that may be relevant to the instant motion.  A merger clause within the CMAA notes that it supersedes any prior agreements between the parties, whether oral or written, and that the CMAA "may be changed or amended only by an amendment in writing signed by all of the [p]arties[.]"  (CMAA § 11.C).  The CMAA also clarifies that it "embodies the entire understanding among the parties" and that the parties would not be bound by any representations or conditions

unless they were expressly stated in the CMAA or set forth in a writing signed by all the parties. (*Id.* § 11.J.). It also notes that it "may only be changed, modified, or amended in writing by the mutual consent of the parties[.]" (*Id.* § 11.K.).

Plaintiff claims that it "fully performed its obligations" as specified by the CMAA's scope of work. (Compl. ¶ 20; *id.* ¶ 26 ("By April 1, 2021, [Plaintiff] had performed substantially all of its obligations under the [CMAA.]")). In particular, Plaintiff avers that it "provided extensive advisory services" to Inspira and that it also introduced several bankers to Inspira who were capable of underwriting the IPO. (*Id.* ¶¶ 21-22). One such banker was The Benchmark Company, LLC ("Benchmark"), which Inspira retained at one point to be the lead underwriter for the IPO. (*Id.* ¶¶ 24-25).

### 2. The Alleged Breach of the CMAA

Despite Plaintiff's performance, the parties ran into issues on April 1, 2021. In particular, Hayon notified Plaintiff and its members via email that Inspira had terminated Benchmark as lead underwriter due to Benchmark's "unacceptable conduct." (Compl. ¶¶ 27-28). Hayon stated that this conduct "resulted in the cancellation of Inspira's pricing and listing … on the NASDAQ," and that Inspira would now be forced to find an alternate underwriter. (*Id.*, Ex. 2). Hayon laid the blame for this development at Plaintiff's feet and suggested that Plaintiff should have known of Benchmark's track record. (*Id.*). Hayon concluded the email by noting that the IPO was now at risk, and that unless Plaintiff agreed to an amendment of the CMAA, "[Inspira] will have no

5

choice but to terminate the [CMAA] as of today, 1st April 2021." (*Id.*; *see also id.* ¶¶ 29-30).  Plaintiff claims that Inspira's "improper termination was a pretext to avoid paying Plaintiff the agreed upon compensation under the [CMAA,]" as there "was no basis" under the CMAA for such termination.  (*Id.* ¶¶ 31-32).  Jonathan Blum, one of Plaintiff's members, responded to this email just over an hour later, and stated that Plaintiff was "prepared to engage in constructive dialogue regarding an appropriate path forward[,]" but that Plaintiff was not "in a position to amend [the CMAA] as you have requested." (*Id.*, Ex. 3; *see also id.* ¶ 34).

Defendants did not respond to Plaintiff's email noting that Plaintiff could not agree to an amendment.  (Compl. ¶ 34).  Accordingly, Plaintiff claims that "despite having no basis to terminate the [CMAA,]" Defendants treated the CMAA as terminated as of April 2, 2021, effecting an anticipatory repudiation. (*Id.* ¶ 35).  Indeed, Plaintiff alleges that Defendants "unequivocally threatened termination of the [CMAA] … unless [Plaintiff] agreed to amend [its] terms[.]" (*Id.* ¶ 39).  Still, Plaintiff clarifies that it was willing to continue performance under the CMAA, but that Defendants did not give it the opportunity to address any issues or to secure another banker to underwrite the IPO.  (*Id.* ¶¶ 40-41). Ultimately, Plaintiff states that it, too, treated the CMAA as terminated on April 2, 2021, following Defendants' ultimatum.  (*Id.* ¶ 36).

### 3. The Parties' Subsequent Oral Contract

The alleged breach of the CMAA was not the end of the parties' dealings, however.  Instead, Plaintiff claims that Defendants recognized that, despite

6

having allegedly terminated the CMAA, they still required Plaintiff's assistance to close the IPO. (Compl. ¶¶ 46-47). As such, Hayon set up a meeting between Plaintiff's members and certain Inspira employees to take place on April 15, 2021. (*Id.* ¶ 48). Plaintiff avers that at this meeting, Hayon "implored [Plaintiff] to assist in the final stages" of the closing, upon realizing that Plaintiff's "expertise and relationships [were] necessary" to closing the IPO in the near term. (*Id.* ¶¶ 52-53). Among other topics, Hayon explained that Inspira wished to continue retaining Lucosky Brookman, LLP ("Lucosky"), the underwriting counsel recommended to Inspira by Plaintiff. (*Id.* ¶ 54).

Yet, per Plaintiff's understanding, the CMAA was no longer in force, and thus Plaintiff owed Defendants no further performance. (Compl. ¶ 55). Thus, "[a]s consideration for bringing [Plaintiff] back into the fold after improperly terminating the [CMAA] two weeks earlier, Defendant Hayon, to induce Plaintiff to provide necessary assistance to Inspira, offered that Defendant Inspira would compensate [Plaintiff] for its assistance in the final stage of the IPO preparation process (the 'Oral Contract')." (*Id.* ¶ 56). Under the Oral Contract, Plaintiff alleges that Defendants agreed to pay Plaintiff seventy-five percent of the fees due to Plaintiff under the CMAA, as Inspira was not proceeding with an Introduced Banker. (*Id.* ¶ 57). Hayon represented that these fees would amount to approximately 75,000 ordinary shares of Inspira stock upon the closing of the IPO. (*Id.* ¶ 58). Plaintiff agreed to this proposal, with the consideration on Plaintiff's part being its promised performance of various advisory services. (*Id.* ¶ 59). Though Hayon promised the 75,000 shares,

7

Plaintiff claims that he made this promise "with the preconceived and undisclosed intent of not compensating Plaintiff as agreed in the Oral Contract." (*Id.* ¶ 61).  Plaintiff alleges that Inspira's Form F-1 filed with the SEC on July 1, 2021, memorializes this key term of the Oral Contract, as it notes that Inspira "agreed to issue to [Plaintiff], in consideration for their advisory and consulting services, 73,321 [o]rdinary [s]hares upon our initial public offering on the Nasdaq Capital Market." (*Id.* ¶ 62; *see also id.*, Ex. 4 (Inspira Form F-1) at 59, 103).

### 4. The Closing of the IPO and Alleged Breach of the Oral Contract

Plaintiff alleges that it provided substantial services to Defendants following formation of the Oral Contract.  (Compl. ¶ 64).  Specifically, Plaintiff claims that it helped transition the IPO to a new underwriter by maintaining Defendants' relationship with Lucosky.  (*Id.* ¶ 65).  On July 14, 2021, Inspira's IPO closed with a non-introduced banker as the lead underwriter.  (*Id.* ¶ 66). Per the terms of the Oral Contract, Plaintiff was thus due approximately 75,000 ordinary shares of Inspira stock.  (*Id.* ¶ 67).  But Defendants did not tender this payment to Plaintiff upon the closing of the IPO, nor have they done so at any time since the closing.  (*Id.* ¶¶ 68-69).  As such, Plaintiff claims that Defendants breached the Oral Contract and that Plaintiff relied to its detriment on Hayon's promise.  (*Id.* ¶¶ 68-70).

### B. Procedural Background

Plaintiff initiated this case by filing the Complaint on March 4, 2022. (Dkt. #1).  The case was originally assigned to United States District Judge J.

Paul Oetken.  However, on April 25, 2022, Defendants, with Plaintiff's consent, requested that the case be reassigned to this Court because of its relation to a prior case before this Court involving the same parties and the same CMAA. (Dkt. #9).  That earlier case had been voluntarily dismissed by Plaintiff on January 28, 2022.  (*Exchange Listing, LLC* v. *Inspira Technologies, Ltd.*, No. 21 Civ. 7557, Dkt. #26).  Judge Oetken granted Defendants' request, and the case was reassigned to this Court on April 29, 2022.

On May 10, 2022, Defendants filed a pre-motion letter, contemplating a motion to dismiss.  (Dkt. #12).  Plaintiff filed a response letter on May 13, 2022, opposing Defendants' contemplated bases for seeking dismissal.  (Dkt. #13). On May 18, 2022, the Court noted that it would dispense with its typical requirement of a pre-motion conference, and instead set a deadline for Plaintiff to submit an amended complaint, if it so chose, and a briefing schedule for Defendants' motion to dismiss.  (Dkt. #14).  Plaintiff did not submit an amended complaint.  Instead, in line with the Court's briefing schedule, Defendants submitted their memorandum of law in support of their motion to dismiss on July 1, 2022.  (Dkt. #15-16).  Plaintiff then submitted its opposition on August 1, 2022.  (Dkt. #17).  Finally, Defendants submitted their reply memorandum of law on August 15, 2022.  (Dkt. #18).

## DISCUSSION

### A.    Motions to Dismiss Under Rule 12(b)(6)

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court should "draw all reasonable inferences in [a]

[p]laintiff['s] favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks and citation omitted).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)).  While the plausibility requirement "is not akin to a 'probability requirement' ... it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* Toward that end, a plaintiff must provide more than "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.*  Moreover, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 557).

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco* v. *MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010); *see also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."); *see generally United States of America ex rel. Foreman* v. *AECOM*, 19 F.4th 85, 106 (2d Cir. 2021), *cert. denied*, 142 S. Ct. 2679 (2022). Beyond this narrow universe of materials, a court may also consider "facts of

which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence" and disregard "allegations in a complaint that contradict or are inconsistent with judicially-noticed facts." *Becker* v. *Cephalon, Inc.*, No. 14 Civ. 3864 (NSR), 2015 WL 5472311, at *3, 5 (S.D.N.Y. Sept. 15, 2015) (internal quotation marks and citations omitted). However, "[a] court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." *Int'l Star Class Yacht Racing Ass'n* v. *Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998) (internal quotation marks and citations omitted).

## B. The Court Grants in Part and Denies in Part Defendants' Motion to Dismiss

Defendants have moved to dismiss in full the Complaint and its eight causes of action. Their motion proceeds in domino-like fashion; in essence, Defendants argue that the Complaint does not state a claim for breach of the CMAA, and thus that claim and the remainder of Plaintiff's claims must fail. For the reasons that follow, the Court grants Defendants' motion as to certain of Plaintiff's quasi-contract claims and Plaintiff's fraudulent inducement claims, and denies the motion as to the remainder of the claims.

### 1. The Complaint Adequately Pleads a Breach of the CMAA

Plaintiff has pleaded that Defendants' April 1, 2021 communication regarding amending the CMAA forms the basis for three distinct theories of

breach of the CMAA — termination, repudiation, and frustration.[3]  Defendants argue that Plaintiff has not adequately pleaded *any* theory of breach, and that the CMAA remained in effect throughout the parties' relationship.  The Court agrees with Defendants that Plaintiff has not adequately pleaded termination or frustration of the CMAA, but finds that Plaintiff has sufficiently stated a claim for anticipatory repudiation of the CMAA.  As such, Plaintiff has adequately stated a claim under Count I of the Complaint for breach of the CMAA.

> ### a.   Applicable Law

> #### i.   Breach of Contract

"To state a claim in federal court for breach of contract under New York law, a complaint need only allege [i] the existence of an agreement, [ii] adequate performance of the contract by the plaintiff, [iii] breach of contract by the defendant, and [iv] damages."  *Harsco Corp.* v. *Segui*, 91 F.3d 337, 348 (2d Cir. 1996).[4]  It is rudimentary that a plaintiff cannot state a claim for a breach of contract where the defendant's time for performance has not passed.  *See, e.g.*, *Franconia Assocs.* v. *United States*, 536 U.S. 129, 142-43 (2002) (explaining that "[f]ailure by the promisor to perform at the time indicated for performance in the contract establishes an immediate breach[,]" whereas "the promisor's

---

[3]    The Court presumes that these theories are pleaded in the alternative.  *See* Fed. R. Civ. P. 8(d)(2) ("A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones.  If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient.").

[4]    The parties' briefing assumes that New York law controls this Court's consideration of all of the relevant claims, "and such 'implied consent … is sufficient to establish choice of law.'"  *Krumme* v. *WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000) (quoting *Tehran-Berkeley Civ. & Env't Eng'rs* v. *Tippetts-Abbett-McCarthy-Stratton*, 888 F.2d 239, 242 (2d Cir. 1989)).

renunciation of a contractual duty *before* the time fixed in the contract for ... performance is a repudiation" (internal quotation marks and citations omitted) (emphasis in original)); *Jin Yung Chung* v. *Sano*, No. 10 Civ. 2301 (DLI) (CLP), 2011 WL 1298891, at *4 (E.D.N.Y. Mar. 31, 2011) ("The fact that the loan has not yet been repaid does not alone establish that the [c]orporate [d]efendants have breached any agreement.  Instead, [p]laintiff must plead the agreed upon time for performance or, if no time for performance was agreed upon, [p]laintiff must allege facts that show a reasonable time for performance has passed."); *Muskat* v. *Mosesson*, No. 08 Civ. 1575 (JG) (RER), 2008 WL 5786131, at *1 (E.D.N.Y. Dec. 10, 2008) ("[W]ithout knowing when the loans became due, the fact that the loans have not yet been repaid does not, by itself, establish that defendant breached." (citing *Bernstein* v. *La Rue*, N.Y.S.2d 896, 897 (2d Dep't 1986))); *see generally* RESTATEMENT (SECOND) OF CONTRACTS § 235(2) (1981) ("Non-performance is not a breach unless performance is due.").

### ii.    Anticipatory Repudiation

"Anticipatory repudiation occurs when, before the time for performance has arisen, a party to a contract declares his intention not to fulfill a contractual duty."  *Lucente* v. *Int'l Bus. Machines Corp.*, 310 F.3d 243, 258 (2d Cir. 2002).  Anticipatory repudiation "can be either a statement by the obligor to the obligee indicating that the obligor will commit a breach that would of itself give the obligee a claim for damages for total breach or a voluntary affirmative act which renders the obligor unable or apparently unable to perform without such a breach."  *Princes Point LLC* v. *Muss Dev. L.L.C.*, 30

N.Y.3d 127, 133 (2017) (quoting *Norcon Power Partners* v. *Niagara Mohawk Power Corp.*, 92 N.Y.2d 458, 463 (1998)).

"For an anticipatory repudiation to be deemed to have occurred, the expression of intent not to perform by the repudiator must be 'positive and unequivocal.'" *Princes Point LLC*, 30 N.Y.3d at 133 (quoting *Tenavision, Inc.* v *Neuman*, 45 N.Y.2d 145, 150 (1978)). "Whether a particular communication or act constitutes repudiation of a contract generally presents a question of fact." *In re Best Payphones, Inc.*, 432 B.R. 46, 55 (S.D.N.Y. 2010); *accord Bercow* v. *Damus,* 776 N.Y.S.2d 289, 291 (2004). However, "[a]n exception applies where the repudiation is in writing, in which case the court may resolve the issue of repudiation 'as a matter of law.'" *DiFolco*, 622 F.3d at 112 (quoting *York Agents, Inc.* v. *Bethlehem Steel Corp.*, 318 N.Y.S.2d 157, 158-59 (1st Dep't 1971)). Still, "[e]ven if the repudiation is in writing … where the written expressions are ambiguous as to their meaning, 'then such determination [*i.e.*, repudiation] is to be made by the jury.'" *Id.* (quoting *Hartford Acc. & Indem. Co.* v. *Wesolowski*, 33 N.Y.2d 169, 172 (1973)).

When confronted with an anticipatory repudiation, the non-repudiating party has two mutually exclusive options. It may either (i) "elect to treat the repudiation as an anticipatory breach and seek damages for breach of contract, thereby terminating the contractual relation between the parties," or (ii) "continue to treat the contract as valid and await the designated time for performance before bringing suit." *Lucente*, 310 F.3d at 258.

Where a plaintiff proceeds on both a breach of contract theory and an anticipatory repudiation theory — both of which theories constitute a breach if proven — a court may dismiss one of the claims as duplicative.  *See, e.g.*, *Safka Holdings LLC* v. *iPlay, Inc.*, 42 F. Supp. 3d 488, 492 (S.D.N.Y. 2013) (dismissing *sua sponte* breach of contract claim premised on same factual predicates as anticipatory repudiation claim (citing *Sorrell* v. *Inc. Vill. of Lynbrook*, No. 10 Civ. 49 (DRH) (GRB), 2012 WL 1999642, at *5 n.4 (E.D.N.Y. June 4, 2012); *4Kids Entm't, Inc.* v. *Upper Deck Co.*, 797 F. Supp. 2d 236, 249 (S.D.N.Y. 2011))); *see also Mayweather Promotions, LLC* v. *PAC Ent. Worldwide LLC*, No. 21 Civ. 4378 (VEC), 2022 WL 3997014, at *6 (S.D.N.Y. Sept. 1, 2022) ("[Counter-claim defendant] treated [plaintiff's] purported text message as a repudiation of the contract and, as it was entitled to do (if in fact there was a repudiation), quit performing.  [Counter-claim defendant] thus demonstrated that it elected to treat the contract as broken rather than subsisting, enabling it to plausibly seek damages only under an anticipatory repudiation theory.").

### iii.        Frustration

"The doctrine of frustration of purpose excuses a party's performance only in situations where a 'virtually cataclysmic, wholly unforeseeable event renders the contract valueless to one party.'"  *Tycoons Worldwide Grp. (Thailand) Pub. Co.* v. *JBL Supply Inc.*, 721 F. Supp. 2d 194, 203 (S.D.N.Y. 2010) (quoting *United States* v. *Gen. Douglas MacArthur Senior Vill., Inc.*, 508 F.2d 377, 381 (2d Cir. 1974)); *see also Warner* v. *Kaplan*, 892 N.Y.S.2d 311, 314 (1st Dep't 2009) ("In order to invoke the doctrine of frustration of purpose,

the frustrated purpose must be so completely the basis of the contract that, as both parties understood, without it, the transaction would have made little sense[.]" (internal quotation marks and citations omitted)).  "In addition, '[t]he doctrine of frustration of purpose does not apply unless the frustration is substantial,' and it is therefore 'not enough that the transaction has become less profitable for the affected party or even that [the affected party] will sustain a loss.'"  *CAI Rail, Inc.* v. *Badger Mining Corp.*, No. 20 Civ. 4644 (JPC), 2021 WL 705880, at *7 (S.D.N.Y. Feb. 22, 2021) (quoting *Rockland Dev. Assocs.* v. *Richlou Auto Body, Inc.*, 570 N.Y.S.2d 343, 344 (2d Dep't 1991)).

### b.  Analysis

#### i.  Plaintiff Adequately Pleads a Claim for Anticipatory Repudiation

Plaintiff adequately pleads that Defendants anticipatorily repudiated the CMAA in violation of Section Nine of the CMAA, and that Plaintiff treated the CMAA as breached.  *First* and as a threshold matter, the Complaint adequately alleges conduct that could constitute an anticipatory repudiation of the CMAA by Inspira.  Simply stated, Hayon, a representative of Inspira, presented Plaintiff with an ultimatum to which Plaintiff did not agree on April 1, 2021. Hayon stated that, absent Plaintiff's acquiescence to the amendment, Defendants would "have no choice but to terminate the [CMAA] as of today, 1st April 2021."  (Compl., Ex. 2; *see also id.* ¶¶ 29-30).  Plaintiff did not agree to the amendment on April 1, 2021, although Plaintiff did note that it was "prepared to engage in constructive dialogue[.]"  (*Id.*, Ex. 3; *see also id.* ¶ 34). Thereafter, the Complaint pleads that there was radio silence, and that both

16

parties treated the CMAA as terminated and only eventually reengaged when they entered into the separate Oral Contract.  (*Id.* ¶¶ 34-41).  These facts are sufficient to state a claim that Defendants anticipatorily repudiated the CMAA for several reasons.

Case law recognizes that demanding an extracontractual term as a not-previously-agreed-upon condition precedent to performing under a contract may constitute an anticipatory repudiation, particularly where the plaintiff rejects such a term and treats the contract as breached.  *See, e.g.*, *O'Connor* v. *Sleasman*, 788 N.Y.S.2d 518, 520 (3d Dep't 2005) ("[W]e find that the issue regarding the anticipatory repudiation was … dependent upon … defendant's September 16, 2002 fax detailing the numerous modifications he appeared to be requiring before he would complete the contract.  As plaintiff immediately rejected the proposed modification by declaring the contract to be in breach, we find that a question of fact was raised on the issue of anticipatory repudiation."); *see also Mometal Structures, Inc.* v. *T.A. Ahern Contractors Corp.*, No. 09 Civ. 2791 (MKB), 2013 WL 764717, at *8 (E.D.N.Y. Feb. 28, 2013) ("[Counter-claim defendant's] requirement that [counter-claim plaintiff] agree to modifications of the [s]ubcontract before [counter-claim defendant] would perform its contractual obligations constitutes an anticipatory breach of the [s]ubcontract."); *Briarwood Farms, Inc.* v. *Toll Bros.*, No. 07 Civ. 3657 (CS), 2010 WL 11530552, at *5 (S.D.N.Y. Nov. 1, 2010) (noting that an anticipatory repudiation can "'be grounded upon a finding that the other party has attempted to avoid its obligations by advancing an untenable interpretation of

17

the contract, or has communicated its intent to perform only upon the satisfaction of extracontractual conditions.'" (quoting *SPI Commc'ns, Inc.* v. *WTZA-TV Assocs. Ltd. P'ship*, 644 N.Y.S.2d 788, 791 (3d Dep't 1996) (internal quotation marks omitted)), *aff'd*, 452 F. App'x 59 (2d Cir. 2011) (summary order).

Accepting as true the well-pleaded allegations of the Complaint, the Court finds that this is precisely what occurred here. Plaintiff rejected Defendants' ultimatum that Plaintiff agree to an extra-contractual amendment of the CMAA on April 1, 2021, or else Inspira would wrongfully terminate the CMAA. Thus, on April 2, 2021, Plaintiff was entitled to treat the CMAA as effectively over, given that Defendants stated they intended to terminate the CMAA in clear terms. *A fortiori*, Plaintiff was entitled to assume that Defendants had positively and unequivocally expressed their intention not to perform (which performance included compensating Plaintiff in line with Section 4 of the CMAA) under the CMAA if Plaintiff, for example, continued rendering advisory services or worked to find another Introduced Banker to complete the IPO at a later point.

This result might be different, if, for example, Defendants accepted Plaintiff's olive branch and the parties worked through any differences. Perhaps discovery will end up showing that this is precisely the path the parties took, and that they did proceed under the CMAA despite Defendants' ultimatum. But today, Defendants cannot simply rely on semantic sleights-of-hand (*see* Def. Reply 4 (stating that the parties' email correspondence was

"expressly equivocal" because Hayon said "*should*" and "*we will have no choice*" (emphasis in Defendants' brief)) or attempt to artificially cabin the ultimatum that was presented to Plaintiff (*id.* (arguing that Plaintiff cannot plead an anticipatory repudiation because Defendants did not expressly state that they would not compensate Plaintiff if Plaintiff presented them with an Introduced Banker)).  Even under Defendants' logic — that the ultimatum was simply a "threat" — Plaintiff has pleaded an anticipatory repudiation, because the triggering event identified by the threat actually came to pass.  Indeed, a threat to breach a contract can constitute an anticipatory repudiation where the threat is sufficiently definite.  *Rachmani Corp.* v. *9 E. 96th St. Apartment Corp.*, 629 N.Y.S.2d 382, 385 (1st Dep't 1995) ("[I]t is clear that there must be a definite and final communication of the intention to forego performance before the anticipated breach may be the subject of legal action.  Mere expression of difficulty in tendering the required performance, for example, is not tantamount to a renunciation of the contract." (internal citations omitted)).

Further, even where an alleged anticipatory repudiation is in a written communication, if the written communication is ambiguous, the issue of whether an anticipatory repudiation occurred presents one of fact.  Thus, even at the motion for summary judgment stage, courts have deemed conflicting written communications going to an anticipatory repudiation as an issue suitable for a jury.  *See, e.g.*, *DiFolco* v. *MSNBC Cable L.L.C.*, 831 F. Supp. 2d 634, 643 (S.D.N.Y. 2011) ("[W]hether [p]laintiff communicated her intent to resign and whether [individual defendant's] interpretation of [p]laintiff's

19

communications as a resignation was reasonable are questions of fact for a jury to decide."); *cf. Vision Ent. Worldwide, LLC* v. *Mary Jane Prods., Inc.*, No. 13 Civ. 4215 (AT), 2014 WL 5369776, at *3 (S.D.N.Y. Oct. 17, 2014) ("Here, [defendant's representative's] e-mail that stated, 'This date is cancelled, nothing to discuss,' … was an anticipatory repudiation.  'This date' referred to the concert, and [defendant's representative] was clearly declaring [defendant's] intention not to perform its future obligations under the [a]greement."). Though the Court finds nothing ambiguous about Defendants' threat here and the ensuing course of conduct between the parties — at least as pleaded in the Complaint — Defendants' written communication is at least ambiguous as to its meaning and whether it could be perceived as an anticipatory repudiation, which is sufficient to survive a motion to dismiss.

*Second*, Plaintiff pleads that it treated Defendants' repudiation as an anticipatory breach and the CMAA as defunct.  (Compl. ¶ 36).  While Defendants contend that it is implausible that the parties treated the CMAA as defunct because Plaintiff's alleged performance under the purported Oral Contract appears substantively identical to that contemplated by the CMAA, the Court cannot resolve such a fact issue at this stage.  (Def. Br. 13-14).  At this point, it is sufficient for Plaintiff to plead that the parties treated the CMAA as breached and no longer proceeded thereunder.  Defendants' contention is better suited to testing at the summary judgment stage, not at this early point in the litigation.  *See, e.g., Hosp. Auth. of Rockdale Cnty.* v. *GS Cap. Partners V Fund, L.P.*, No. 09 Civ. 8716 (PAC), 2011 WL 182066, at *3 (S.D.N.Y. Jan. 20,

2011) (rejecting defendant's argument that plaintiff's acceptance of half of capital due under contract defeated claim for anticipatory repudiation because "[t]he question of whether [plaintiff] accepted this $35 million, which is far from conceded, whether it proceeded under the allegedly-repudiated agreement or, in the wake of [defendant's] breach, attempted to negotiate a new agreement in order to mitigate the breach presents questions of fact that cannot be determined at this juncture").  Though discovery may disprove Plaintiff's core contention related to anticipatory repudiation — that it viewed Defendants' conduct as an anticipatory breach rather than posturing — the Complaint alleges otherwise.  In this respect, the Court also agrees with Plaintiff that Defendants' argument is not based on a faithful reading of the Complaint.  (*See* Pl. Opp. 13 & n.1 (arguing that "Defendants blatantly mischaracterize the Complaint's allegations to buttress" its arguments, insofar as the Complaint pleads performance under the subsequent Oral Contact, and *not* the CMAA)).

Accordingly, the Court finds that Plaintiff has adequately pleaded that Defendants anticipatorily repudiated the CMAA in violation of the CMAA's termination provisions, and that such repudiation worked to prevent Plaintiff from receiving further compensation under the CMAA despite the CMAA providing such opportunity to Plaintiff.  So, too, does Plaintiff adequately allege that it treated Defendants' repudiation as an anticipatory breach and that Defendants would not compensate Plaintiff in the future regardless of Plaintiff's performance.

### ii.    Plaintiff Does Not Adequately Plead Claims for Termination or Frustration

Though Plaintiff has pleaded a cognizable theory of anticipatory repudiation and breach, the same cannot be said of its claims for termination and frustration.  As to termination, Plaintiff argues that Defendants breached the CMAA because they stated that they would terminate the CMAA in their April 1, 2021 email correspondence unless Plaintiff agreed to an amendment of the CMAA.  (Pl. Opp. 10-11).  Because Plaintiff did not agree to an amendment on April 1, 2021, and because this purported termination was improper (*i.e.*, not contemplated by the express terms of the CMAA), Plaintiff argues that this course of conduct constituted a breach.  (*Id.*).

However, the Complaint does not actually allege that Defendants in fact terminated the CMAA (as opposed to threatening to terminate it) or took any additional steps to terminate the CMAA, such as providing the requisite written notice.  (*See* CMAA § 9).[5]  Further, there is no indication that Defendants' time

---

[5]    Defendants also contend that Plaintiff's claim regarding termination of the CMAA is implausible because Plaintiff pleaded in its amended complaint in the prior action that Inspira never terminated the CMAA.  (Def. Br. 11-12).  In effect, Defendants ask the Court to find that Plaintiff cannot state a claim for termination because such theory is directly contradicted by the complaints in the prior action, and that the Complaint in this action is functionally an amended complaint vis-à-vis the complaints in the prior action.  This contention is the source of much disagreement between the parties regarding the proper scope of judicial notice of the pleadings in the prior action and whether the Complaint plainly contradicts the pleadings in the prior action.  (*Compare* Def. Reply 4 ("This is precisely the sort of blatant change of fact in an attempt to avoid a dispositive defense that allows courts to accept an earlier, now contradicted statement as true."), *with* Pl. Opp. 9 ("[R]ather than being contradictory, the Complaint here alleges a different theory of recovery based upon the facts alleged in the original action, together with additional facts alleged in the Complaint here.")).

It is well-accepted that "[i]n the Rule 12(b)(6) context, a court may take judicial notice of prior pleadings, orders, judgments, and other related documents that appear in the court records of prior litigation and that relate to the case *sub judice*[,]" *Ferrari* v. *Cnty. of Suffolk*, 790 F. Supp. 2d 34, 38 n.4 (E.D.N.Y. 2011), but only "to establish the fact of

for performance under the CMAA had passed on April 1, 2021, or that Defendants acted upon their threat.  Indeed, the only performance that Defendants appeared to owe to Plaintiff under the CMAA was the compensation payments contemplated by the CMAA if Plaintiff were able to secure an Introduced Banker with whom Defendants might complete the IPO.  (Compl. ¶¶ 42 (pleading that Defendants' actions "foreclosed the possibility of [Plaintiff's] performance and entitlement to the lion's share of its compensation under Section 4 of the [CMAA]"), 44 (reiterating the payments Defendants would owe to Plaintiff if Defendants completed the IPO with an Introduced Banker)).  But by April 1, 2021, Defendants had not completed the IPO, let alone with an Introduced Banker.  (*See id.* ¶ 37 ("Inspira's improper termination of the [CMAA] prevented Plaintiff's ability to continue to performance under the [CMAA] because Plaintiff could not introduce new bankers to [] Inspira to act as the underwriter for the IPO.")).  There is simply no indication that Defendants' time for performance had passed, but instead

---

such litigation and related filings" and "not for the truth of the matters asserted in the other litigation[,]" *Glob. Network Commc'ns, Inc.* v. *City of New York*, 458 F.3d 150, 157 (2d Cir. 2006).  So, too, is it accepted that though ordinarily an amended complaint "supercedes the original, and renders it of no legal effect," *Dluhos* v. *Floating & Abandoned Vessel, Known as N.Y.*, 162 F.3d 63, 68 (2d Cir. 1998) (internal quotation marks and citation omitted), "where allegations in an amended pleading directly contradict pleadings in the original complaint, courts have disregarded the amended pleading[,]" *Underwood* v. *Coinbase Glob., Inc.*, No. 21 Civ. 8353 (PAE), 2023 WL 1431965, at *6 (S.D.N.Y. Feb. 1, 2023) (internal quotation marks and citations omitted).  Thus, an interesting question arises regarding how the Court ought to view the pleadings in the prior action, and whether it can take judicial notice of the fact that they at least superficially contradict Plaintiff's new termination theory, provided the Complaint here is deemed an amended complaint.  But because the Court finds that Plaintiff has not adequately pleaded that Defendants "terminated" the CMAA, and because the adequately-pleaded anticipatory repudiation theory is a novel theory in this case, the Court finds that it does not need to reach this issue.

that Defendants clearly threatened that they would not perform in the future (*i.e.*, tender compensation commensurate with Section 4 of the CMAA) by terminating the CMAA unless Plaintiff agreed to certain changes of the CMAA.

Likewise, Plaintiff has not pleaded frustration of the CMAA.  The Court agrees with Defendants' arguments that frustration is a narrow contract doctrine reserved only for truly cataclysmic or unforeseen circumstances that entirely undermine a contract's most basic purposes, a theory ill-suited for these circumstances.  (Def. Br. 14).  Indeed, termination of the CMAA was expressly contemplated by its own terms, even if Plaintiff asserts that Defendants wrongfully terminated it.  And it cannot be the case that a simple breach of contract simultaneously constitutes frustration of a contract, given that breaches routinely occur and are a known possibility when parties agree to terms.[6]

---

[6]    Plaintiff appears to conflate New York's frustration and "prevention" doctrines in its discussion of frustration of the CMAA due to Defendants' conduct.  (*See, e.g.*, Pl. Opp. 13-14).  The Court has discussed the frustration doctrine earlier in this Opinion, and finds that the doctrine is inapplicable here, where Plaintiff merely points to the same factual predicates to support its frustration claim as its breach of the CMAA and anticipatory repudiation claims.  It is true that under New York law, "a party may not avoid performance of a contractual duty by preventing the occurrence of a condition precedent (the so-called 'prevention doctrine')."  *Consol. Edison, Inc.* v. *Ne. Utilities*, 426 F.3d 524, 528 (2d Cir. 2005) (citing *Kooleraire Serv. & Installation Corp.* v. *Bd. of Educ.*, 28 N.Y.2d 101, 106 (1971)).  And indeed, some courts have been somewhat loose in their terminology when differentiating among the various theories that give rise to a breach of contract.  *See, e.g.*, *Ide* v. *Brit. Airways PLC*, 529 F. Supp. 3d 73, 84-85 (S.D.N.Y. 2021) (discussing cases analyzing the prevention doctrine and "frustration of ... a condition precedent").  Because the Court finds that Plaintiff has adequately pleaded an anticipatory repudiation, and that the alleged repudiation prevented Plaintiff's performance, the Court finds that Plaintiff's first cause of action survives in any event.  In this regard, this Court is persuaded by the analysis in *Hospital Authority of Rockdale County* v. *GS Capital Partners V Fund, L.P.*, where the court found an anticipatory repudiation, and concomitantly found that the defendant had waived performance of any conditions precedent to its own performance.  No. 09 Civ. 8716 (PAC), 2011 WL 182066, at *3 (S.D.N.Y. Jan. 20, 2011) ("If [defendant] anticipatorily breached this commitment, [it] waived performance of any conditions precedent,

In any event, Plaintiff's termination, frustration, and repudiation theories are entirely duplicative.  (*See, e.g.*, Compl. ¶ 39 (pleading that the same facts giving rise to the alleged termination and frustration — namely, the April 1, 2021 correspondence — "constituted an anticipatory breach of the [CMAA]")). In *Safka Holdings LLC* v. *iPlay, Inc.*, the court was similarly faced with duplicative breach and anticipatory repudiation claims, premised on a letter sent by the defendant to the plaintiff stating that it "need[ed] to mutually withdraw from the [a]greement" and that the defendant "consider[ed] the [a]greement to be mutually terminated."  42 F. Supp. 3d 488, 490 (S.D.N.Y. 2013).  On these facts, the court dismissed the breach claim *sua sponte*, while sustaining the claim for anticipatory repudiation.  *Id.* at 492.  As there, this Court dismisses the duplicative and ill-pleaded theories of termination and frustration.  *See also, e.g.*, *Mayweather Promotions, LLC*, 2022 WL 3997014, at *6 (taking the same approach).

### 2.  The Complaint Adequately Pleads a Breach of the Oral Contract

Defendants have likewise moved to dismiss Count II of the Complaint, which alleges a breach of the parties' Oral Contract following the anticipatory

---

including the execution of the asset purchase agreement." (citing *In re Bankers Tr. Co.*, 450 F.3d 121, 127 (2d Cir. 2006) ("One who unjustly prevents the performance or the happening of a condition of his own promissory duty thereby eliminates it as such a condition.  He will not be permitted to take advantage of his own wrong, and to escape from liability for not rendering his promised performance by preventing the happening of the condition on which it was promised." (internal quotation marks and citation omitted))).  Accordingly, the Court understands Plaintiff's argument to be that Defendants' anticipatory repudiation effectively prevented Plaintiff's performance under the CMAA and its ability to earn the additional compensation contemplated by the CMAA.  The Court agrees that the Complaint adequately alleges this breach theory, and that a "prevention" theory would be duplicative.

repudiation of the CMAA.  Defendants essentially proceed on the premise that the CMAA was not repudiated, and argue that because "the subject matter of the alleged [O]ral [C]ontract is the express subject of the written [CMAA] between the parties[,]" "any alleged [O]ral [C]ontract would be an amendment" to the CMAA.  (Def. Br. 15).  Defendants then contend that, because the CMAA expressly bars oral amendments and modifications, and because Plaintiff has not pleaded any exceptions to the rule against oral modifications of a signed writing, Plaintiff's breach of the Oral Contract claim must fail.  (*Id.* at 15-17).  Plaintiff counters that Defendants proceed from a fundamentally flawed premise in seeking dismissal of this claim, as Defendants "ignor[e] the Complaint's detailed allegations of [] Inspira's termination of the [CMAA]" and the formation of a separate oral agreement.  (Pl. Opp. 15-16).  Plaintiff has the better of the argument on this motion to dismiss.

Defendants' stated bases for dismissal of the breach of the Oral Contract claim rest on Defendants' own characterization of the operation of the Oral Contract vis-à-vis the CMAA, rather than the allegations in the Complaint. True, if the Court had found that the Complaint did not state a claim for an anticipatory repudiation of the CMAA and that Plaintiff had mistakenly treated such repudiation as an anticipatory breach, Defendants' contentions that the Oral Contract was in fact an oral modification might prevail on this motion to dismiss.  Like Plaintiff, however, the Court need not reach Defendants' points that the CMAA barred oral modifications *of its own terms* because the Complaint pleads that the CMAA was defunct and that the parties' dealings

26

following April 1, 2021, represent the formation of the separately enforceable Oral Contract.  *See, e.g.*, *NYKCool A.B.* v. *Pac. Fruit, Inc.*, 507 F. App'x 83, 88 (2d Cir. 2013) (summary order) (holding that arbitration panel did not exceed its authority in holding entities liable under "binding and enforceable *new* [oral] contract" despite prior existence of separate written contracts with entities); *Foxley* v. *Sotheby's Inc.*, 893 F. Supp. 1224, 1234 (S.D.N.Y. 1995) ("[Defendant] first contends that the allegations cannot form the basis for a separate contract because the alleged conversation relates to issues explicitly raised in the [first agreement].  The Court disagrees.  According to the complaint, an independent, express oral agreement with consideration was reached between the parties."); *cf. Robins* v. *Max Mara, U.S.A., Inc.*, 923 F. Supp. 460, 467 (S.D.N.Y. 1996) (rejecting claim that an oral contract was formed because written contract remained in effect, and written contract prohibited oral modifications).

 For these same reasons, the Court will not dismiss the breach of the alleged Oral Contract claim based on Defendants' contentions that Plaintiff's alleged performance was otherwise consistent with the CMAA, or that there was a lack of consideration.  (Def. Br. 17).  Again, accepting as true Plaintiff's allegation that the CMAA was breached, Plaintiff owed no performance to Defendants.  Thus, Plaintiff newly agreeing to provide advisory services to Defendants consistent with what would be expected under the CMAA in exchange for the approximately 75,000 shares does not bespeak a lack of consideration for the Oral Contract, because the CMAA was defunct by this

point.  (Pl. Opp. 15-16).[7]  Defendants' arguments may be fruitful if discovery shows that the CMAA was not breached and that the Oral Contract was really a modification of the CMAA, not a separate agreement.  But for now, in an instance of the parties effectively talking past one another, the Court must credit Plaintiff's allegations.

### 3. The Court Dismisses Certain of Plaintiff's Quasi-Contract Claims as Duplicative of the Breach of the CMAA Claim

Beyond the two contract claims premised on the CMAA and alleged Oral Contract, Plaintiff pleads a variety of quasi-contract claims in the alternative, including: (i) promissory estoppel, premised on Defendants' alleged promise to pay Plaintiff approximately 75,000 ordinary shares in exchange for Plaintiff's advisory services after April 15, 2021 (*i.e.*, concurrent with the alleged Oral Contract) (Compl. ¶¶ 94-100); (ii) quantum meruit, premised on the alleged termination of the CMAA on April 1, 2021 (*id.* ¶¶ 101-113); (iii) quantum meruit, premised on Plaintiff's alleged provision of advisory services after April 15, 2021 (*i.e.*, concurrent with the alleged Oral Contract) (*id.* ¶¶ 114-120); and (iv) breach of the implied covenant of good faith and fair dealing, premised

---

[7]    Defendants have moved to dismiss the Oral Contract breach claim by recasting the Oral Contract as a modification either barred by the CMAA's terms or lacking in consideration.  Defendants have not, for example, questioned whether Plaintiff adequately pleads an oral contract.  Because the Court does not find that Defendants' arguments merit dismissal, inasmuch as they amount to simple disagreements with the allegations in the Complaint, it need not wade into the parties' dispute about what the reference to the 73,321 shares in the F-1 means.  Plaintiff does not contend that the reference is sufficient to amend the CMAA, but instead that it is proof of the Oral Contract.  (Pl. Opp. 16).  Defendants, on the other hand, contend that the reference to the shares is insufficient to amend the CMAA, because it was both erroneous and not signed by the parties.  (Def. Br. 17).  This will be a fact issue down the line, but not one that the Court can resolve today.

on Inspira's alleged termination of the CMAA and demand for extracontractual provisions (*id.* ¶¶ 121-129).

a.   **The Court Dismisses Plaintiff's Quantum Meruit Claim Premised on the CMAA, But Not Plaintiff's Quantum Meruit or Promissory Estoppel Claims Premised on Alleged Post-CMAA Performance**

In New York, quasi-contract claims, like quantum meruit and promissory estoppel, are "obligation[s] the law creates in the absence of any agreement." *Diesel Props S.r.l.* v. *Greystone Bus. Credit II LLC*, 631 F.3d 42, 54 (2d Cir. 2011) (quoting *Goldman* v. *Metropolitan Life Ins. Co.*, 5 N.Y.3d 561, 572 (2005)). As such, "[t]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter." *Clark-Fitzpatrick, Inc.* v. *Long Island R. Co.*, 70 N.Y.2d 382, 388 (1987); *accord iSentium, LLC* v. *Bloomberg Fin. L.P.*, No. 17 Civ. 7601 (PKC), 2018 WL 6025864, at *4 (S.D.N.Y. Nov. 16, 2018) ("Under New York law, a plaintiff may not proceed with a claim of promissory estoppel if there is a valid agreement between the parties."); *Tobias* v. *Notations, Inc.*, No. 14 Civ. 08494 (AT) (GWG), 2015 WL 4654454, at *5 (S.D.N.Y. July 20, 2015) ("Plaintiff alleges the existence of a valid, express employment contract governing her terms of compensation.  Plaintiff's unjust enrichment claim, therefore, cannot survive.").

However, plaintiffs may alternatively plead quasi-contract claims alongside a breach of contract claim where "the defendant does not concede the enforceability of such contract." *Pers. Watercraft Prod. SARL* v. *Robinson*, No. 16 Civ. 9771 (AJN), 2017 WL 4329790, at *11 (S.D.N.Y. Sept. 1, 2017)

(internal quotation marks and citations omitted); *see also, e.g.*, *Piven* v. *Wolf Haldenstein Adler Freeman & Herz L.L.P.*, No. 08 Civ. 10578 (RJS), 2010 WL 1257326, at *9 (S.D.N.Y. Mar. 12, 2010) ("[W]here there is a genuine dispute as to the existence of a contract, [p]laintiffs may assert causes of action in both breach of contract and quasi-contract and need not make a pretrial election between these theories." (internal quotation marks and citations omitted)); *Wilmoth* v. *Sandor*, 686 N.Y.S.2d 388, 390-91 (1st Dep't 1999) ("Where, as here, a bona fide dispute as to the existence or application of a contract is demonstrated, a plaintiff generally will not be required to elect his or her remedies.  Only at trial is the plaintiff required to make an election at a time within the discretion of the [t]rial [j]udge." (internal quotation marks and citations omitted)).

Plaintiff's quantum meruit claim premised on services Plaintiff provided in connection with the CMAA while the CMAA was in force is entirely duplicative of its breach of the CMAA claim.  Neither party disputes the existence of the valid and binding CMAA; instead, the parties disagree over whether Defendants' course of conduct constituted a breach (or an anticipatory breach).  Until the alleged breach of the CMAA, the parties' obligations and performance were subject to the CMAA, and Plaintiff's quantum meruit claim premised on the CMAA rests on exactly the same factual predicates and alleged harms as its breach claim.  (*See* Pl. Opp. 19 ("Inspira's termination of the [CMAA] precluded [Plaintiff's] ability to enforce the [CMAA.]")).  That Plaintiff alleges that the CMAA was breached does not mean that the "contract was void

or otherwise unenforceable." *Chartwell Therapeutics Licensing, LLC* v. *Citron Pharma LLC*, No. 16 Civ. 3181 (RPK) (CLP), 2020 WL 7042642, at *11 (E.D.N.Y. Nov. 30, 2020). It simply means that the CMAA was allegedly breached, not that it had no force *ab initio* as between the parties.

However, Defendants *do* contest the validity and enforceability of the alleged Oral Contract, insofar as they recast the Oral Contract as an improper oral modification of the CMAA. Once again, as to the quantum meruit and promissory estoppel claims premised on Plaintiff's alleged provision of services post-dating the alleged breach of the CMAA (*i.e.*, following the parties' April 15, 2021 meeting), the parties simply disagree as to the relevant facts. For example, Defendants state that Plaintiff's claims must be dismissed as duplicative because the parties agree that the CMAA was enforceable and because it was not terminated. (Def. Reply 6). Yet, Plaintiff's quantum meruit and promissory estoppel claims flowing from the April 15, 2021 meeting at which Plaintiff allegedly agreed to provide advisory services to Defendants in exchange for approximately 75,000 shares are alternative quasi-contract claims for the Oral Contract, not the CMAA. (Pl. Opp. 17-18 (noting that Defendants contest the "enforceability and existence of the Oral Contact" and that the Court accordingly should not dismiss the promissory estoppel claim premised on similar factual predicates), 20-21 (same, with respect to the quantum meruit claim)). As such, because Defendants have called into question the Oral Contract, Plaintiff's quantum meruit and promissory estoppel

claims premised on the parties' alleged post-CMAA conduct are not duplicative at this stage in the litigation.

### b. The Court Dismisses Plaintiff's Implied Covenant of Good Faith and Fair Dealing Claim

"Under New York law, parties to an express contract are bound by an implied duty of good faith, but breach of that duty is merely a breach of the underlying contract." *Cruz* v. *FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013) (quoting *Harris* v. *Provident Life & Accident Ins. Co.*, 310 F.3d 73, 80 (2d Cir. 2002)). "A claim for breach of the implied covenant of good faith and fair dealing does not generally provide a cause of action separate and distinct from a breach of contract claim." *Bald Hill Builders, LLC* v. *2138 Scuttle Hole Rd. Realty, LLC*, No. 17 Civ. 107 (ADS) (GRB), 2017 WL 3668769, at *3 (E.D.N.Y. Aug. 23, 2017).

Plaintiff is correct that it "may bring two breach of contact claims, one based on breach of the express terms and the other based on breach of the implied duty, as long as they are supported by factually distinct allegations." *Hosp. Auth. of Rockdale Cnty.*, 2011 WL 182066, at *4. And in *Hospital Authority*, the court was in fact confronted by a somewhat similar factual scenario as that here. There, the court found that the plaintiff stated a claim for an anticipatory repudiation where the defendant was obligated to provide $88 million in funding under a contract, but informed the other parties to the contract that it would provide only $35 million. *Id.* at *3. This was sufficient to state a claim for an anticipatory repudiation, and the court also found that the plaintiff stated a factually distinct claim for a breach of the duty of good faith

and fair dealing.  *Id.* at *4-5.  The court found that this latter claim was not duplicative, because it was not premised on the defendant's "mere announcement of its intent not to perform, but rather its refusal to provide an explanation, the timing of its decision, and its knowledge of [the other parties'] reliance on its commitment."  *Id.* at *5.

Here, by contrast, the Court discerns no daylight between Plaintiff's breach claim premised on the alleged anticipatory repudiation of the CMAA, and its breach of good faith and fair dealing claim.  These two counts of the Complaint rest on identical factual premises, even if Plaintiff attempts to recast Defendants' alleged conduct.  Though Plaintiff alleges three distinct theories of breach in Count I of the Complaint, it is clear that Plaintiff's alleged harm is that Inspira breached the CMAA "with the intent to prevent Plaintiff from introducing a banker with whom [] Inspira could complete the IPO, which was a condition precedent to Plaintiff receiving the lion's share of compensation provided for in the [CMAA]."  (Compl. ¶ 81).[8]  Similarly, in Count VI, the good

---

[8]     In their briefing, the parties dispute whether the 150,000 warrants discussed in the CMAA were merely "payable upon execution of the [CMAA]" and thus effectively gratuitous (Pl. Opp. 4, 20 n.2), or whether the warrants were consideration for Plaintiff's performance under the CMAA (Def. Br. 6).  So, too, do the parties dispute whether Defendants ever tendered the warrants to Plaintiff.  (Pl. Opp. 4; Def. Br. 6).  For its part, the Complaint does not discuss the warrants or whether Plaintiff in fact received them; instead, as it relates to the CMAA, the Complaint evinces only a concern over Defendants' alleged denial of Plaintiff's ability to earn additional compensation under the CMAA by, *inter alia*, finding an Introduced Banker to underwrite the IPO.  Of course, it defies common sense to contend that the warrants were gratuitous and not consideration for the CMAA.  More basically, the CMAA appears fairly clear on this point.  (*See* CMAA § 4 ("[Inspira] agrees to compensate [Plaintiff] in the following manner *as consideration* of the [s]ervices to be rendered hereunder ... [Inspira] will issue [Plaintiff] 150,000 warrants[.]" (emphasis added)).  Because Plaintiff does not appear to seek relief as it relates to the warrants, the Court need not resolve the issue, but only mentions the dispute in the context of Plaintiff's contention regarding the "lion's share" of compensation contemplated by the CMAA.

faith claim, Plaintiff pleads that Inspira breached this implied condition of the CMAA "by demanding extracontractual conditions as an ultimatum to Plaintiff with the alternative being [] Inspira's termination of the [CMAA], thereby foreclosing Plaintiff's ability to realize compensation" contemplated by the CMAA.  (*Id.* ¶ 124).  Thus, both purported breaches prevented Plaintiff from earning additional compensation contemplated by the CMAA.  Likewise, Plaintiff seeks the same damages for both express breach and breach of the duty of good faith.  (*Compare id.* ¶ 129, *with id.* ¶ 82).  And though Plaintiff attempts to suggest that it is proceeding on separate factual grounds under both theories of breach — for example, by stating that the breach of the duty of good faith and fair dealing claim rests on "Inspira's extracontractual ultimatum" (Pl. Opp. 22) — this is precisely the theory that Plaintiff offers in favor of finding an anticipatory repudiation (*id.* at 12-13).  Plaintiff's alleged damages did not flow from this threat or ultimatum, as Defendants point out, but rather from Plaintiff's *rejection* of the ultimatum and concomitant understanding that Defendants intended not to perform under the CMAA. (Def. Reply 6-7).

To be clear, the Court does not reject the notion that Defendants' alleged anticipatory repudiation of the CMAA deprived Plaintiff of the right to perform under the CMAA and to earn the compensation contemplated by Section Four of the agreement.  *See supra* n.6; *see also, e.g.*, *MBIA Ins. Corp.* v. *Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A.*, No. 09 Civ. 10093 (RJS), 2011 WL 1197634, at *14 (S.D.N.Y. Mar. 25, 2011) (noting that a contract has "an

implied obligation not to do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract or to act in such a way as to frustrate[ ] or prevent[ ] the occurrence of the condition" (internal quotation marks and citations omitted)).  And in this respect, Plaintiff's anticipatory repudiation of the CMAA theory is closely related to a breach of good faith theory.  *See, e.g., Westerbeke Corp.* v. *Daihatsu Motor Co.*, 304 F.3d 200, 212 (2d Cir. 2002) (collecting cases discussing the relationship between the prevention doctrine and the breach of the implied duty of good faith).  But as discussed in this Opinion, this theory is plainly cognizable as a theory of breach premised on the terms of the CMAA itself.  (*See* CMAA § 1.C. (noting that "[i]ntroducing [Inspira] to investment bankers … to underwrite the IPO" was part of Plaintiff's scope of work); *id.* § 4 ("Subject to … [Inspira's] retention of any of the Introduced Bankers with whom [Inspira] completes an IPO within 12 months, and unless this Agreement is terminated as provided in Section 9 hereof … [Inspira] agrees to compensate [Plaintiff] as follows")).  Plaintiff adequately pleads that Defendants violated Section Nine of the CMAA through their anticipatory repudiation, thereby depriving Plaintiff of the possibility of earning additional compensation.  Thus, "the gravamen of Plaintiff's good faith and fair dealings claim is based on alleged breaches of [the CMAA] and involve the same facts underlying his breach of contract claim[,]" and is accordingly dismissed.  *Knutson* v. *G2 FMV, LLC*, No. 14 Civ. 1694 (RWS), 2018 WL 286100, at *8 (S.D.N.Y. Jan. 3, 2018).

4.   **The Court Dismisses Plaintiff's Fraud in the Inducement Claim Against Both Defendants**

To succeed on a claim of fraudulent inducement under New York law, the plaintiff must show that: "[i] the defendant made a material false representation, [ii] the defendant intended to defraud the plaintiff thereby, [iii] the plaintiff reasonably relied upon the representation, and [iv] the plaintiff suffered damage as a result of such reliance." *Axginc Corp.* v. *Plaza Automall, Ltd.*, 759 F. App'x 26, 30 (2d Cir. 2018) (summary order) (quoting *Bridgestone/Firestone, Inc.* v. *Recovery Credit Servs., Inc.*, 98 F.3d 13, 19 (2d Cir. 1996)).  In addition, allegations of fraud must "[i] specify the statements that the plaintiff contends were fraudulent, [ii] identify the speaker, [iii] state where and when the statements were made, and [iv] explain why the statements were fraudulent." *Nakahata* v. *N.Y.-Presbyterian Healthcare Sys., Inc.*, 723 F.3d 192, 197 (2d Cir. 2013) (citation omitted); *see also* Fed. R. Civ. P. 9(b).

Critically, a fraud claim that "is simply a breach of contract claim in [] tort clothing" is not cognizable.  *Telecom Int'l Am. Ltd.* v. *AT & T Corp.,* 280 F.3d 175, 196 (2d Cir. 2001).  An allegation of fraudulent inducement "may not be used as a means of restating what is, in substance, a claim for breach of contract," and "general allegations that defendant entered into a contract while lacking the intent to perform it are insufficient to support a fraud claim.'" *Wall* v. *CSX Transp., Inc.*, 471 F.3d 410, 416 (2d Cir. 2006) (internal quotation marks and citation omitted); *see also Telecom Int'l Am. Ltd.,* 280 F.3d at 196 ("[W]here a fraud claim arises out of the same facts as plaintiff's breach of

36

contract claim, with the addition only of an allegation that defendant never intended to perform the precise promises spelled out in the contract between the parties, the fraud claim is redundant and plaintiff's sole remedy is for breach of contract." (quoting *Sudul* v. *Computer Outsourcing Servs.,* 868 F. Supp. 59, 62 (S.D.N.Y. 1994))).  To maintain a claim for fraudulent inducement that does not merge with a breach of contract claim, a plaintiff must:

> (i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages.

*Bridgestone/Firestone,* 98 F.3d at 20 (citations omitted).

With particular respect to this second element, courts have identified a key distinction between a "misrepresentation of present fact," which is actionable, and "a misrepresentation of future intent to perform under the contract," which merges with the contract claim and thus cannot support a separate fraud claim.  *See, e.g., Gosmile, Inc.* v. *Levine,* 915 N.Y.S.2d 521, 524 (1st Dep't 2010) ("To state a claim for fraudulent inducement, there must be a knowing misrepresentation of material present fact, which is intended to deceive another party and induce that party to act on it, resulting in injury .... [A] misrepresentation of present facts, unlike a misrepresentation of future intent to perform under the contract, is collateral to the contract, even though it may have induced the plaintiff to sign it, and therefore involves a separate breach of duty." (citations omitted)).  In other words, "simply dressing up a

37

breach of contract claim by further alleging that the promisor had no intention, at the time of the contract's making, to perform its obligations thereunder is insufficient to state an independent tort claim." *Telecom Int'l Am. Ltd.,* 280 F.3d at 196 (internal quotation marks and citations omitted).

Plaintiff's fraudulent inducement claim against Inspira is entirely duplicative of its breach of Oral Contract claim against Inspira. Plaintiff's only allegations supporting a fraudulent inducement claim against Inspira are that Inspira promised approximately 75,000 ordinary shares upon completion of the IPO to Plaintiff (*i.e.*, Inspira's alleged consideration for the Oral Contract), and that Inspira made this promise "with no intention of acting upon or honoring the promised consideration." (Compl. ¶¶ 132-135). This is a quintessential example of a misrepresentation of an intent to perform under a contract, and Plaintiff offers nothing in the way of distinguishing the claim from the breach of Oral Contract claim. (Pl. Opp. 24-25). Plaintiff similarly makes no attempt to contend that this promise is collateral to the Oral Contract; indeed, this promise is the *core* of the Oral Contract. Whether Inspira intended to perform or not under the Oral Contract is simply irrelevant, and Plaintiff's only plausible claim lies in contract, not tort.

There is a wrinkle in the analysis of the fraud claim that only Plaintiff identifies, however. Plaintiff brings this claim against both Inspira and Hayon, a purported non-party to the Oral Contract. Plaintiff correctly notes that courts applying New York law have held that a plaintiff may separately state a claim for fraud against a non-party to a contract that would otherwise be

barred as duplicative of a breach of contract claim against a party to the

contract.  (*See* Pl. Opp. 24).  *See, e.g., Sun Prod. Corp.* v. *Bruch*, 507 F. App'x

46, 48 (2d Cir. 2013) (summary order) ("[A] fraud claim may be dismissed *as

duplicative* only as against a defendant against whom the related contract

claim is viable." (quoting *Richbell Info. Servs.* v. *Jupiter Partners, L.P.*, 765

N.Y.S.2d 575, 589 (1st Dep't 2003))); *Apple* v. *Atl. Yards Dev. Co., LLC*, No. 11

Civ. 5550 (JG) (JMA), 2012 WL 2309028, at *7 (E.D.N.Y. June 18, 2012) ("The

rule that a plaintiff may not base a fraud claim on a breach of contract has no

application to anyone who is not a party to the relevant contract."); *LIUS Grp.

Int'l Endwell, LLC* v. *HFS Int'l, Inc.*, 939 N.Y.S.2d 525, 527 (2d Dep't 2012)

(affirming denial of fraud claim against corporate defendant as "not sufficiently

distinct from the breach of contract cause of action[,]" but reversing denial of

fraud claim against individual because "plaintiff sought compensatory damages

which are not recoverable for breach of contract" (internal quotation marks and

citations omitted)).  Defendants, on the whole, have not argued that the

fraudulent inducement claim against both Inspira and Hayon fails for reasons

other than being duplicative of the breach of Oral Contract claim.  (*See* Def.

Br. 21-22; Def. Reply 7-10).[9]  Despite Defendants' apparent oversight, the

---

[9]     Defendants have additionally argued that the fraudulent inducement claim fails for the
independent reason that Plaintiff fails to allege reasonable reliance.  (Def. Reply 9-10).
But this argument is premised on the contention that the CMAA remained in force and
barred amendments not in writing and not signed by the parties.  For the same reasons
that Defendants' arguments in favor of dismissing the breach of Oral Contract claim
fail, so too does this argument.

Court finds that the fraudulent inducement claim should be dismissed against Hayon as duplicative of the breach of contract claim.

Courts' application of the above rule demonstrates that, despite being broad in theory, it is narrow in practice.  For example, in cases allowing fraudulent inducement claims to move forward against non-parties to the contract where they might otherwise be duplicative of a breach claim against a contracting party, the alleged misrepresentation must be distinct from merely representing the *party's* intent to perform under the contract.  *See, e.g.*, *Wild Bunch, SA* v. *Vendian Ent., LLC*, 256 F. Supp. 3d 497, 501 (S.D.N.Y. 2017) (finding misrepresentation that party could provide financing without further approvals made by non-party to contract to be distinct from contractual representation that party would provide $3 million in gap financing); *Fratelli BVBA* v. *APM Music Servs., LLC*, No. 20 Civ. 6208 (JPC), 2021 WL 4429417, at *5 (S.D.N.Y. Sept. 27, 2021) (finding fraud claim against non-party to contract could proceed because non-party made misrepresentations about his own intent to perform services and falsely promised to wire money following formation of contract); *cf. Sun Prod. Corp.* v. *Bruch*, No. 10 Civ. 4816 (SAS), 2011 WL 5120307, at *3 (S.D.N.Y. Oct. 28, 2011) (granting summary judgment in favor of plaintiff on fraud claim against non-contracting defendant because defendant intentionally underreported royalties contemplated by contract).

On the other hand, where the alleged misrepresentation is simply a representation by a non-party that the party will in fact perform under the contract (*i.e.*, a representation made on behalf of the contracting party), courts

have found fraud claims to be duplicative, even as against the non-party.  *See,
e.g.*, *Coinmint, LLC* v. *Main Mill St. Invs., LLC*, No. 18 Civ. 1404 (GTS) (CFH),
2019 WL 4015687, at *8 (N.D.N.Y. Aug. 26, 2019) ("The lease and [plaintiff's]
allegations therefore do not plausibly suggest that [individual officer-defendant]
was acting on his own behalf rather than on behalf of [LLC defendant], and
[that] those alleged representations nonetheless were not separate and distinct
from the obligations on [LLC defendant] imposed by the lease itself."); *see also
Khurana* v. *Wahed Inv., LLC*, No. 18 Civ. 233 (LAK) (BCM), 2020 WL 364794, at
*12 (S.D.N.Y. Jan. 8, 2020) (dismissing fraud claim against CEO because it
"rests squarely on [the] allegation that [CEO] had no intent of actually causing
[the Company] to issue the promised equity, that is, of honoring the contract,
when [the CEO] made it" (internal quotation marks and citations omitted)),
*report and recommendation adopted*, 2020 WL 364022 (S.D.N.Y. Jan. 22, 2020);
*cf. Forty Cent. Park S., Inc.* v. *Anza*, 14 N.Y.S.3d 11, 12 (1st Dep't 2015) ("[T]he
fraud cause of action against [manager of contracting party] is not duplicative
of the breach of contract cause of action against [contracting party], since it is
based upon representations that [manager] made that are separate and distinct
from [contracting party's] obligations under the operating agreement.").  This
distinction makes sense.  Otherwise, "plaintiffs could sue the corporation (who
was a party to the contract) for breach of contract, and then bring a separate
suit for fraud against the individual who represented the corporation, thereby
bringing duplicative fraud and breach of contract claims."  *Lefkowitz* v.

*Reissman*, No. 12 Civ. 8703 (RA), 2014 WL 925410, at *5 n.1 (S.D.N.Y. Mar. 7, 2014).

The allegations in the Complaint demonstrate that the alleged misrepresentation by Hayon — that Inspira would perform under the Oral Contract — was made in a purely representative capacity, and related solely to Inspira's obligations under the Oral Contract.  The Complaint pleads that "Hayon agreed that [] *Inspira* would pay [Plaintiff] 75% of its fees due under the [CMAA], since [] Inspira was not proceeding with an Introduced Banker." (Compl. ¶ 57 (emphasis added)).  And while the Complaint alleges that "Hayon made this promise with the preconceived and undisclosed intent of not compensating Plaintiff as agreed in the Oral Contract[,]" the promise was Inspira's sole obligation under the Oral Contract, not Hayon's.  (*Id.* ¶ 61).

The Complaint's Seventh Cause of Action for fraud in the inducement only underscores the point.  Beyond stating the uncontroverted proposition that Hayon had a duty to not make material misrepresentations, it does not mention Hayon at all, and only refers to "Defendants."  (Compl. ¶¶ 130-141).  A cursory review of the cause of action makes it apparent that the claim is simply a means of repackaging the breach of Oral Contract claim against Inspira, and identifies no separate harm caused by Hayon nor any statements made by Hayon in an individual capacity.  (*See, e.g.*, *id.* ¶ 135 ("Defendants offered the consideration to Plaintiff with no intention of acting upon or honoring the promised consideration.")).

Accordingly, even though Plaintiff additionally brings the fraudulent inducement claim against Hayon, a purported non-party to Oral Contract, the claim is solely concerned with an alleged statement of Inspira's intent to perform.  For the same reasons that this claim is duplicative of the breach of Oral Contract claim against Inspira, it is duplicative as against Hayon.

## CONCLUSION

For the reasons discussed in this Opinion, Defendants' motion to dismiss is GRANTED in part and DENIED in part.  Specifically, the Court grants Defendants' motion with respect to the Complaint's Fourth, Sixth, and Seventh causes of action.[10]  Defendants are ORDERED to answer the remaining claims in the Complaint on or before **March 29, 2023**.  The parties are further ORDERED to submit a joint letter and proposed case management plan on or before **April 5, 2023**.

The Clerk of Court is directed to terminate the pending motion at docket entry 15.

SO ORDERED.

Dated:      March 8, 2023
            New York, New York

_____
        KATHERINE POLK FAILLA
        United States District Judge

---

[10]     The parties' dispute about whether Plaintiff is entitled to attorneys' fees (Count VIII) under Section 11.B of the CMAA is quite obviously premature at this stage, as such fees are only available to the prevailing party.  (*See* Def. Br. 22; Pl. Opp. 25).